27 C.C.P.A. (Patents)

### BENSON v. BEMAN.
### Patent Appeal No. 4192.

Court of Customs and Patent Appeals.
Feb. 5, 1940.

Rehearing Denied March 20, 1940.

Barnes, Kisselle & Laughlin, of Detroit, Mich. (John M. Kisselle and Stuart C. Barnes, both of Detroit, Mich., of counsel), for appellant.

R. E. Baker, of Detroit, Mich. (Donald B. Waite, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences in an interference proceeding involving applications for patents relating to evaporators for use in mechanical refrigerators, particularly, refrigerators of the household type.

The interference embraces four counts but there is no separate issue as to any one of them. Counsel for both parties quote count 3 as representative. It reads: "3. A sheet metal evaporator comprising an outer one piece shell and an inner one piece shell bent to form the side and bottom walls of a sharp freezing chamber, arcuate depressions formed parallel to and spaced from the ends of one of said shells and also spaced from the front and back edges of said shell, said arcuate depressions cooperating with the other shell to form headers located at the ends of the shells but adjacent each other due to the bent form of the evaporator, embossed portions formed in one sheet and extending around the side and bottom walls of the evaporator and connecting the two headers, said shells being welded together around the front and back peripheries and across the end peripheries, a connecting T forming a common refrigerant outlet between said two headers and an inlet connection formed at the bottom of the evaporator and communicat-

ing with the embossed portions in the bottom wall of the evaporator."

The respective tribunals of the Patent Office concurred in awarding priority to Beman, who is the senior party, his application, serial No. 556,420, having been filed August 11, 1931. The application of Benson, serial No. 657,491, was filed February 20, 1933.

There was another interference case, No. 67,691,[1] between these parties in which there was a third party not here involved. That case involved a single count covering the same general subject matter covered by the counts now before us, but broader in scope. The decisions of the respective tribunals in the instant case are quite brief and each refers to its decision in that interference for a full statement of the reasons applied here. The facts are substantially the same in both cases and the record supplied in that case is, so far as material, the same as the record supplied here. The decisions which were rendered there were made a part of the record here, and we have necessarily looked to them to ascertain the complete viewpoint of the tribunals of the Patent Office upon the issues involved. The review of the testimonial record was made in the decisions in that case. Beman prevailed there, being awarded November 10, 1930 for conception and "as early as December 24, 1930" for reduction to practice of that count, while Benson was confined to his filing date for both, as he was in the instant case.

The decision of the board in the instant case embraces the following statement:

"The subject matter of the interference is a sheet metal evaporator consisting of two sheets carrying embossings so as to form headers at two opposite ends of the superimposed sheets and these headers are joined by corrugations which extend at right angles to said headers. This interference is closely related to the companion interference No. 67,691 decided concurrently herewith in which the parties to this interference are both involved. The same record and briefs were submitted in both interferences. The counts in this interference are more limited than the count of interference No. 67,691 in that they include a T-connection between the top headers and also the feature of first making the evaporator in the flat and then bending after welding.

"In interference No. 67,691 we have held that the party Benson has failed to establish a date of invention prior to the filing date of the senior party, and for the same reason we reached the same conclusion in this interference. The Examiner of Interferences has held that the party Beman has established conception of the invention defined in the counts in issue as of February 12, 1931 with an actual reduction to practice as early as May 22, 1931. We are convinced that his conclusions are correct."

It is the contention of Benson that he was prior in the matter of conception and reduction to practice and that Beman derived the invention from him. Hence, Benson insists that the only question in the case is one of originality. Beman, on the other hand, contends that Benson cannot be awarded any date for conception and reduction to practice earlier than his (Benson's) filing date, which was long subsequent to the dates awarded to Beman and long subsequent to Beman's filing date (as was held by the tribunals below), and, hence, insists that the question of originality is not in the case. However, Beman argues that even if we should reverse the decision of the board as to the first ground, the record does not sustain Benson's contention as to originality.

The board did not refer to the question of originality either in its decision in interference No. 67,691, or in its decision in the instant case. The Examiner of Interferences made no reference to it in the instant case, but in interference No. 67,691 (after finding against Benson on the matter of conception and reduction to practice) said: "From the above analysis of the testimony, it is apparent that if in fact the only question to be decided is that of originality, Beman must be held the original inventor. The question of originality must be decided on the basis of surrounding circumstances. As indicated above the outstanding surrounding circumstance is that Benson had no conception to communicate to Beman. Any conception which Benson may have had was of an inoperative evaporator and he, therefore, had no conception of the invention defined in the issue and could not have communicated knowledge of the invention to Beman."

---

[1] Unofficially we are advised that this case has been made the subject of an equity proceeding under R.S. § 4915, 35 U.S.C.A. § 63.

In view of the somewhat unusual state of facts presented by the record, it will conduce to clearness of understanding to make a general statement regarding them, although the recital of some of them may not be strictly necessary to our decision.

Both Benson and Beman are refrigerator engineers and during the latter part of 1929 and the first part of 1930 were co-employees of Mullins Manufacturing Company, of Salem, Ohio, which at that time was manufacturing and selling evaporators of a type not here involved, but of which a sample was placed in evidence as Benson's Exhibit 4, being referred to by Benson in his testimony relating to conception.

The exact relationship of Beman to Mullins Manufacturing Company is not altogether clear. He testified that he "did work intermittently for them," doing consulting work on refrigeration; that he had a contract with the company "in connection with a regulating device * * * for regulating liquid in a refrigerating system"; that he had no other duties there, but that he "did occasionally help them out on sales contacts and gave them a little free advice, or quite a lot of free advice"; that he charged nothing for the advice but did charge for the sales contacts, and that he "was under no obligation for anything except the regulator."

He also testified that "After 1928" he did "consulting work for a number of companies," Crosley Radio Corporation, of Cincinnati, Ohio, being named as one of such companies. The time during which he did the consulting work for this company is not stated, but it is stated "it was on refrigeration."

Benson's sole employment during the period referred to, so far as the record shows, was with Mullins Manufacturing Company "as a research engineer in the new refrigeration department," in which capacity he claims to have made the invention at issue.

Whatever may have been the contractual relationship of the respective parties with the Mullins Company, it appears that that company early in 1930 learned of the purpose of the Crosley Radio Corporation to place a refrigerator on the market, and Benson and Beman together visited the Crosley plant, late in March, or early in April 1930, with the hope of procuring a contract for supplying the latter with evaporators. It was found that the type of evaporator illustrated by Benson's Exhibit

4, then being sold by Mullins, was unsuited to the Crosley refrigerator. Hence, interest arose in designing another evaporator. Benson testifies, in substance, that he conceived the invention involved in his application following his return from Cincinnati, working on it from April 3, 1930 to about May 1, 1930. A sketch made by Benson at that time was placed in evidence as Benson's Exhibit 1, and upon it he bases his claim of conception.

In August 1930 Beman, this time alone, again visited the Crosley plant in connection with the business, being authorized to do so by one of the officials of the Mullins Company, which company paid him for his services in that connection. While there a blue print was made which was introduced in evidence as Benson's Exhibit 9. Beman testified that it was made by one of Crosley's draftsmen under his (Beman's) direction. The drawing bears date of August 13, 1930. In his preliminary statement Beman claimed conception, disclosure to others, and drawings "on or about August 12th, 1930," and we assume that Benson's Exhibit 9 was the basis of these claims.

Upon his return to the Mullins plant about August 13, 1930, Beman exhibited the drawing to Benson and others, and Benson testified that after he had examined it he told Beman that it embraced his (Benson's) idea, and that Beman retorted "What do you care whose idea it is as long as Mullins gets the business?" This testimony was corroborated by Benson's witness Earl L. Patterson, an employee of the Mullins Company, who worked under Benson's directions, and who was present at the interview. When the attention of Beman was specifically directed to Benson's testimony above stated, his reply was "I am unable to confirm that conversation."

Beman also carried back with him a letter from the Crosley Company, addressed to the Mullins Company, which read in part as follows:

"Some time ago one of your salesmen showed us some of your standard refrigerator evaporators, none of which would fit our needs. We have therefore designed one ourselves, a blue print of which is enclosed.

"We would like to have you quote cost for us through Mr. Beman for six samples and also quantity price on this evaporator.

"We are sending purchase order and prints to you by Mr. Beman, and as we have fully explained our problem to him,

will ask you to confer with him should your designer observe any changes or suggest any method of cutting corners.

"We will appreciate your prompt execution of this order, and on completion will you please turn the samples over to Mr. Beman for delivery to us, as he has agreed to observe the results of our tests on these models."

The record discloses that, after an examination of Benson's Exhibit 9 in the Mullins plant, it was concluded that it would be difficult to manufacture a structure in strict accord with it, and that Benson (Beman testified that it was under his (Beman's) direction) made a sketch deemed to be practical. This was placed in evidence as Benson's Exhibit 10. It bears date of August 15, 1930. The board says (in its decision in interference No. 67,691) that this sketch "contains most of the features disclosed in Exhibit 9."

The Mullins Company proceeded to manufacture six evaporators in conformity with Exhibit 10, five of which were shipped to the Crosley Company, and, as stated by the board (in interference No. 67,691), "there is nothing in this record indicating what became of them." No one from the Crosley Company testified in the case. It appears from the testimony of persons connected with the Mullins Company that no devices other than the five or six samples were ever sold to the Crosley Company. The sixth sample, which was placed in evidence as Beman's Exhibit B, was turned over to Beman, and it appears from the latter's testimony that it and the other five were tested under his supervision at the Crosley plant. The dates of these tests are not stated, but it seems a fair inference that it must have been shortly after their manufacture, because Beman testified that he thought Mullins was paying his expenses while he was therefor the tests, and Beman, about October 1, 1930, entered the employ of the Kelvinator Corporation, of Detroit, Michigan, to whom, he testified, he sold the "design" (meaning, as we understand it, the design of his Exhibit B), the contract being dated October 1, 1930.

Concerning the test of Exhibit B at the Crosley plant, Beman said: "The Evaporator produced refrigeration to a certain extent, but its disengaging space was so small it caused the compressor to frost back, and it also caused the evaporator to oil bind. That was because the liquid level lay somewhere down in these tubes, not in the disengaging space below. You could not properly charge it to compensate for that."

It is noted that in his preliminary statement Beman claimed reduction to practice "on or about August 18, 1930," and first written description on October 15, 1930.

Benson in his preliminary statement claimed conception, disclosure to others, and drawings on different days in May 1930; embodiment in a full sized device on or about August 25, 1930, and tests "in a full size working model in the city of Salem, Ohio, * * * and in Cincinnati, Ohio, on or about September 1, 1930."

Evidently, so far as their preliminary statements were concerned, both parties at the time of making them relied, in part at least, upon the tests made in the Crosley plant at Cincinnati, although it is somewhat difficult to understand why Beman should have done so in view of his testimony regarding the test of his exhibit quoted, supra.

However, if the views of the tribunals of the Patent Office respecting the matters of conception and reduction to practice be correct, all that was done prior to February 12, 1931 is immaterial here. The holding of the Examiner of Interferences affirmed by the board was to the effect that neither Benson nor Beman conceived the invention at issue, to say nothing of its reduction to practice, earlier than that date which was awarded Beman for conception.

To state it differently: As we understand the decision below, it was held, first, that Beman's Exhibit B was shown to be inoperative, wherefore it did not respond to the counts in issue or embody the invention defined by them, and, second, that no drawing to which such exhibit conformed, no matter by which party made, could be accepted as embodying conception of the invention. Beman fared no differently from Benson, in the decisions below, respecting the activities and developments which took place during the period when they were associated in the work of the Mullins Manufacturing Company. Each was denied both conception and reduction to practice during that period.

The Examiner of Interferences held that the actual invention defined by the counts was conceived by Beman as of February 12, 1931, being shown in a drawing filed in evidence as Beman's Exhibit G, and that it was reduced to practice at least as early

as May 22, 1931 by tests of a device embodied in Beman's Exhibit M, which is also in evidence. The board concurred in this finding and we need not consider it here, because Benson does not challenge its correctness. It is his contention that the invention was present in the 1930 drawings and in Beman's Exhibit B, as has been related.

It is noted that the Examiner of Interferences stated one ground adverse to Benson which the board seems not to have discussed. It related to what Benson in his brief refers to as "two-piece shells." It will be observed from count 3, supra, that the structure requires an outer shell and an inner shell, each of which shells shall be in one piece. The Examiner of Interferences held that the testimony of one Erickson, who was works manager of the Mullins plant during 1930, disclosed that Exhibit B was "* * * butchered out by piecing up and welding standard sections that had been made for other jobs * * *," and, hence, could not be considered as either conception or reduction to practice of the invention.

This matter is discussed in the brief on behalf of Benson before us and other testimony bearing upon the question is referred to, but, as we view the case, it is unnecessary to determine the correctness of the holding of the Examiner of Interferences upon that particular point.

There is no showing that any tests were ever made at the Mullins plant, or, to be exact, "in the city of Salem, Ohio," as was claimed in Benson's preliminary statement, nor, as is stated by the board (in interference No. 67,691), is there anything in the record "to indicate that the party Benson ever tested out the evaporator."

It appears that the device was at one time tested by, or under the supervision of, one Frank P. West, who stated that he was consulting engineer of the Kelvinator Corporation on development work from 1930 to 1932. The time of such test, or tests, was not fixed by the witness any more definitely than that it was "during the fall of 1931." From our analysis of the testimony of West, we agree to the correctness of the following statement of the board (in interference 67,691) concerning it: "While he did say that under certain conditions he believed that the evaporator might be made to operate satisfactorily, this was purely a matter of opinion,

for in the tests to which he subjected it, it did not work satisfactorily in that refrigerant was carried over into the suction pipe which caused frosting."

Substantially all the testimony—that of Beman—concerning the tests at the Crosley plant has been quoted, supra.

The only other test to which attention need be given was made under the supervision of one Lawrence A. Philipp, an engineer employed by the Kelvinator Corporation, who was called as a witness by Beman. The time of this test was not stated definitely but it seems a fair inference that it occurred in the latter part of 1930.

It is not deemed necessary to quote the testimony of Philipp verbatim. It is epitomized in part in the decision of the board (in interference No. 67,691) as follows: "Dr. Philipps has testified that he personally supervised the testing of exhibit B and found that the headers were not large enough and this caused a 'frost back' in the suction pipe. The party Beman has also testified to the same effect."

The board then said (in interference No. 67,691): "It may be said here that practically all household refrigerating devices utilize evaporators of the flooded type. In using evaporators of this type it is absolutely essential that the outlet header be made of such a size as to enable complete separation of gas from the liquid refrigerant for otherwise it is inevitable that slugs of liquid and oil will be carried back to the compressor. In exhibit B the outlet headers are made so small that it is apparent that separation of liquid and gas cannot take place except when the refrigerator is under but little 'load'. If the inflow of heat is quite small the evolution of gas would be so gradual as to cause but little disturbance in the liquid held in the side corrugations and under these circumstances it might be possible to operate the device satisfactorily, but under normal conditions it is believed that 'frosting back' would inevitably occur. In order to obtain the advantages conferred by an actual reduction to practice, the evidence of successful operation must be clear and positive and must not be based on conjecture alone. Apparently all that was necessary to make the evaporator, exhibit B, operative was to enlarge the headers at the top, so that there might be a proper separation of liquid refrigerant from the returning gas.

Although the difference was a small one, still it was vital in that it marked the line between failure and success."

In view of the emphasis with which counsel for Benson have urged the unimportance, from the inventive standpoint, of increasing the size of the headers, we think it not amiss to quote the following from the cross-examination of Dr. Philipp:

"X Q. 80. Dr. Philipp, you spoke of the two top headers in the evaporator being too small, you said, to get satisfactory commercial performance. Would it take a lot of ingenuity to make these headers slightly larger? A. I think it would take an inventive type of mind to conceive of the positioning of the suction connection on this type of evaporator.

"X Q. 81. Suction connection? A. Suction connection, suction outlet; in other words, if the headers in this evaporation were simply made larger here, it would not help out the situation much, because you have a connection directly—that is, the suction connection on the evaporator connects directly with one of the vertical convolutions; that is one thing. Another thing is that your inlet connection is exactly directly under the suction connection.

"X Q. 82. You think it would take invention to connect that outlet to the side wall of the header instead of to one of the convolutions? A. No, not the side wall. This evaporator is made this way: This connection here would have to be connected in the cross header here where the size of it and the location was such that you would not get liquid flowing across here and come out on the suction line.

"X Q. 83. Well, regardless how you do it, from a sheet metal fabricating standpoint, after you tested evaporator Exhibit B, did you now know, in your own refrigeration experience, that those headers were too small? A. Well, I could say that the colume capacity of the evaporators is too small by looking at it, if that is what you mean.

"X Q. 84. In other words, if you were to fix it up yourself for commercial use, you would tell your engineering division or sheet metal division to make larger headers in there? A. I would do more than that. I would tell them to make larger headers in there and position the suction connection from those headers to that you would not get liquid sp-ashing into the suction outlet connection. Just

simply increasing the header size would not help out the situation."

Upon the record presented, we are in harmony with the conclusion reached below. The cases of Nelson et al. v. Campbell, 92 F.2d 974, 25 C.C.P.A., Patents, 749, and Steenstrup v. Heath, 95 F.2d 514, 25 C.C.P.A., Patents, 981, while not controlling of the issue here, the facts of the respective cases being somewhat different, are regarded as pertinent citations, and we find nothing in the authorities cited by counsel for Benson which leads us to a different view respecting the merits of this case.

In view of the facts related, the question of originality is not involved.

The decision of the Board of Appeals is affirmed.

Affirmed.